[Sac. No. 1751. In Bank.—November 9, 1911.]

## D. J. ERGO, Respondent, v. MERCED FALLS GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

NEGLIGENCE—WORKING NEAR DANGEROUS ELECTRIC WIRES—KNOWLEDGE OF DANGER — CONTRIBUTORY NEGLIGENCE — MOMENTARY FORGETFULNESS OF DANGER.—Where an employee of an electric-light and power company, while working in close proximity to wires carrying a high current of electricity, which he knew to be dangerous and to be avoided, comes in contact with such wires as the result of his forgetfulness of the danger, he is guilty of contributory negligence precluding a recovery for the resultant shock, if there was no emergency or unexpected event at the time of the accident which tended to confuse or agitate him or distract his attention from the wires.

ID.—ABSENCE OF EXCUSE FOR FORGETFULNESS.—It is negligence for one to remember and avoid a known danger in one moment, and to forget it the next where nothing has happened to confuse or distract him or cause such forgetfulness except his own failure to exercise his memory.

ID.—INSTRUCTION—PREPONDERANCE OF EVIDENCE—IMMATERIAL ERROR.—Where the jury is otherwise properly and fully instructed as to what constitutes a preponderance of the evidence, an instruction that "if the weight of all the evidence in the case tending to prove the fact is of greater weight than all the evidence tending to disprove the fact, then the fact is said to be proven by a preponderance of the evidence," although erroneous, cannot be held sufficiently injurious to justify a new trial.

APPEAL from a judgment of the Superior Court of Merced County and from an order refusing a new trial. L. W. Fulkerth, Judge presiding.

The facts are stated in the opinion of the court.

F. G. Ostrander, and C. H. Wilson, for Appellant.

F. W. Henderson, for Respondent.

THE COURT.—The defendant has appealed from the judgment below and also from an order denying a new trial.

Plaintiff sued to recover damages caused by an electric shock received by him while he was in the service of the defendant. The basis of his complaint is that he was directed by defendant to work in a place where he would be in close proximity to the defendant's wires charged with a high power and dangerous electric current, and that defendant negligently failed to inform him that the electricity was then turned on to the wires, or of the dangers therefrom, that he did not know the current was on, and was ignorant of the dangers thereof and of the means of avoiding shocks therefrom, and that while working in that place as directed, he received a severe shock of electricity from said wires causing the damage sued for.

The defendant denied that it had directed the plaintiff to work in the dangerous place alleged, and alleged that it gave the plaintiff directions to avoid the wires in question and instructed him in regard to the dangers from the electricity carried by them, and that the accident was caused by his failing to observe due care with respect thereto while in proximity to the wires. Inasmuch as we have concluded that the latter defense is established by the plaintiff's own testimony, we shall not refer to the place in which he was at work further than is necessary to elucidate his testimony.

The defendant is supplying electricity to the city of Merced and its inhabitants by electricity from a generating plant at Merced Falls on the Merced River. It is carried on three wires to a transformer house in Merced, whence it is distributed to the consumers. The accident occurred at the transformer house, which was then in course of construction. Plaintiff was working for defendant as a plumber's helper, putting water pipes in said transformer house to connect with perforated cooling pipes on the roof thereof. The house had three roofs, but we are concerned with only two, which we shall call the main roof and the upper roof. The main roof covers the entire house. The upper roof covers only eight feet in width of the main roof, four feet on each side of the comb thereof, and is

nearly five feet above the main roof, with walls extending from its eaves down to the main roof, both at the ends and sides. The cooling pipes were situated on the upper roof, one on each side of the crest. The plaintiff and a plumber named Bone were laying pipes to connect the water main with these cooling pipes. The three power wires, from one of which plaintiff received the shock, extend from a pole near the south end of the house into the space between the two roofs and were there fastened to three insulators fifteen inches apart on a cross-arm from which they were carried to the transformers. As plaintiff understood and undertook to execute the directions of the defendant with respect to the manner of attaching these connecting pipes, it was necessary to run the pipe into the space between these two roofs, and there by means of an elbow continue it, by a so-called standpipe about five feet long, through the roof to a connection with the cooling pipes. It was while he was engaged in attaching this standpipe to the elbow below after it had been handed to him by Bone, who was on the upper roof above, through a hole which Bone had made in the roof for that purpose, that the plaintiff received the injury.

On the north end of the house there were other wires passing from the house for the distribution of the current.

In answer to special interrogatories the jury found that the plaintiff believed that the wires at the point where he was then engaged were free from electric current and harmless and that he had not been warned of the danger, which might result from coming in contact with said wires sufficiently to enable him to appreciate the extent of the danger. It also found specially that he had not been warned to be careful of said wires. In view of the evidence this finding must have been intended to mean that he had not been warned to be careful with respect to the wires entering the south end of the house. The evidence showed without conflict that he had been warned with regard to the wires at the north end.

In regard to the warning given to him by the defendant, plaintiff's testimony was as follows: One Parker, defendant's foreman in charge of a gang of men laying water mains, directed Bone and the plaintiff how they should lay the pipes. In doing so, he first placed a ladder at the north end of the house, going up the ladder to the top of the roof, plaintiff following next up the ladder and Bone coming last. The wires

passing out of the north end of the house came within about
eighteen inches of the ladder.   As they ascended the ladder
Parker said, "Look out for the wires."  These wires were then
in plain sight and no others were visible from that point.
This was the only warning that was given to the plaintiff.
Parker, it is true, said that he told Bone and Ergo how to lay
the pipes and directed them "to keep away from all wires as
they were dangerous."   In view of the verdict in favor of the
plaintiff we must regard the plaintiff's testimony on this sub-
ject as correct so far as it is inconsistent with that of Parker.
It may be conceded that this warning would not have been
sufficient to a person who was himself ignorant of the charac-
teristics or dangers of electricity when carried on such wires.
It appears, however, from the whole of the plaintiff's testi-
mony that he was not so ignorant as to be unaware of this
danger, although he endeavored to impress the jury with the
fact that he was.   The pleadings admit that at that time he
was twenty-three years of age.

His testimony in chief on this point was in effect as follows:
At the time he went into the space between the roofs to attach
the standpipe he did not know that there was a current of
electricity passing over the wires at that end of the building
and did not think that there was.   He did not know what the
wires were.   He knew they had nothing but common wire.
He did not know that there were any electric wires, or any-
thing about the wires, or that they were wires conducting the
electricity from the plant of the defendant to the transformer.
He had never had any experience in electrical work and knew
nothing about the handling of electrical wires.

His testimony on cross-examination was as follows:  When
twelve years of age he went to work as cashboy in a big Chi-
cago department store which was lighted by electricity.   The
city of Chicago was also lighted by electricity at that time.
He knew that electricity furnished light, but did not know it
caused the light.   He had never heard that and had never
paid any attention to it.   He had lived six months in Alameda,
which city was lighted by electricity and had electric cars
running.   He had ridden on them often and had seen the
motormen stop and start the cars, but had never asked any
questions about it, and did not know how they were propelled.
He had seen them climb the hills in San Francisco and had

thought it singular that they could do it without horses, but made no inquiry and knew not how it was done, nor what the power was. The city of Merced was lighted with electricity, and he had lived there four or five years immediately prior to the accident. He had seen pumps working in Merced with wires connecting with them, but did not make any inquiry about them. He was absolutely ignorant of what is meant by a current of electricity, or a live wire, and he did not know that electric wires carried a force of electricity or power that was used for power and lights. When he was cautioned to look out for the wires, he understood that it was dangerous to come in contact with them and that he must keep away from them. When Parker showed him how to lay the pipe in the south end of the building where the injury occurred he gave no warning to be careful of the wires. When he went in between the two roofs to attach the standpipe, he saw the three wires leading in there and was careful to avoid them. Being asked "Why?" he said: "In case there was electricity in them and in case there was not," and added that if there was he would avoid the wire, but that he did not know that it would be dangerous if he came in contact with it, nor whether the caution given applied to the wires at the south end or not. At the moment he was attaching the standpipe to the elbow he did not pay any attention how close he was to the nearest wire. He was then busy getting the pipe together and wanted to be quick because he and Bone had been told that they were slow and that they were to hurry the work. This, he supposed, caused him to forget everything about the wires at the moment of adjusting the pipe, although he had thought of them a moment before. He saw the wires above him after he got in between the roofs, but when Bone passed the piece of pipe through the hole in the roof down to him, he took hold of it, and then the wires passed out of his mind entirely. He attempted to insert the pipe into the elbow, received the electric shock, and was rendered unconscious. The jury found that the piece of standpipe, in order to extend from the roof above to the elbow, must be passed within seven inches of one or more of the wires.

It is obvious from this testimony that the defendant was aware of the fact that the wires at the south end of the transformer house were dangerous and that for that reason he

deemed it necessary to avoid them, and that his coming in contact with them was not due to ignorance of the danger but to his forgetfulness thereof at the moment of attaching the pipe. The case is not like *Giraudi* v. *Electric Imp. Co.,* 107 Cal. 125, [48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108], and similar cases, where it is said that a momentary failure to recollect something which had been observed some time in the past when there is no reason or occasion to take note of it, does not, as matter of law, constitute negligence, but may or may not be negligence in fact according to the circumstances, and that in such a case it is for the jury to consider whether or not it was negligence. There was nothing unusual or unexpected in the work the plaintiff was then doing. The complaint that they were slow and the order to hurry up was made to them in the afternoon of the previous day. There was no emergency or unexpected event at the moment of attaching the pipe to confuse or agitate him, no sudden necessity for haste or hurry in that particular operation, or at that moment, to distract his attention from the wires. He had them in mind the moment before and avoided them. It is negligence for one thus to remember and avoid a known danger in one moment and forget it the next when nothing has happened to confuse or distract him, or cause such forgetfulness except his own failure to exercise his memory. The case is not one of the exceptional kind in which such forgetfulness may not be incompatible with reasonable care. (*Brett* v. *Frank,* 153 Cal. 272, [94 Pac. 1051].) It follows therefore that the injury the plaintiff received was caused in part at least by his own contributory negligence. Such being the case he cannot recover from the defendant the damages caused thereby.

The defendant claims that the court erred in instructing the jury as to what constitutes a preponderance of the evidence. A part of the instruction complained of is as follows: "If the weight of all the evidence in the case tending to prove the fact is of greater weight than all the evidence tending to disprove the fact, then the fact is said to be proven by a preponderance of the evidence." This passage taken alone is erroneous. It is obvious that the evidence tending to prove a fact might be so slight that it would fail to satisfy the jury of the existence of the fact, and yet it might be of greater weight than other evidence introduced which would tend to

disprove the fact. In such case the fact could not be said to be proven either by a preponderance of the evidence or at all. But this passage cannot be thus taken from the context, nor separated from the other instructions given. It was contained in an instruction pointing out to the jury the difference between the proof beyond a reasonable doubt, that was necessary to justify a conviction in a criminal case, and the proof by a preponderance of the evidence, necessary in a civil case. In instruction 10, given, at the request of the defendant, the court charged that: "The rules applicable to a case of this character cannot be given you in a single sentence and that there must necessarily be many exceptions and modifications to many of the rules of law that I give to you. For that reason you must consider this charge as a whole and so apply it as a whole to all the evidence in this case. You are not at liberty to judge the evidence by some single rule that you may pick out from this charge and which seems to meet with your approval, but you must judge the evidence by all of the rules, with their exceptions and modifications, as I give them to you in this charge." Other instructions declare that all the facts necessary to establish the plaintiff's case must be proven by a preponderance of the evidence. Instruction 31, given at the request of the defendant, was in part as follows: "The burden of proving carelessness or negligence rests on the plaintiff, and in this case before plaintiff is entitled to your verdict he must produce a preponderance of the evidence, that is to say, show to a moral certainty, or in other words introduce that degree of proof that produces conviction in an unprejudiced mind—that the defendant was guilty of carelessness or negligence directly causing the accident and injury complained of. . . . All that is required of defendant is that it produce evidence enough to offset the effect of plaintiff's evidence, and if, at the end of the case, the plaintiff has not shown by a preponderance of evidence that the defendant was guilty of carelessness or negligence directly causing the accident or injury complained of, or if the evidence is equally balanced, or if you are satisfied from the evidence that the accident was due to the carelessness or negligence of the plaintiff, or that by the exercise of ordinary care plaintiff could have guarded against or prevented the same, then I instruct you that your verdict in this case must be in favor of

the defendant." In view of these latter instructions we cannot say that the passage from the instruction first quoted would have been sufficiently injurious of itself to have justified the reversal of the order denying a new trial. But for the reasons heretofore given the motion should have been granted.

The judgment and order are reversed.